OPINION OF THE COURT
Green, J.
In 2006 the Rochester City Council (City Council) adopted an ordinance codified as chapter 45 of the Code of the City of Rochester (Code) establishing a nighttime curfew for juveniles (Ordinance No. 2006-246 [hereafter, ordinance]). The ordinance took effect on September 5, 2006.[1] With certain exceptions (see Code § 45-4), the ordinance makes it unlawful for minors, defined as persons under the age of 17 pursuant to section 45-2, to be in a public place between the hours of 11:00 p.m. and 5:00 a.m. Sunday through Thursday and between midnight and 5:00 a.m. on Friday and Saturday {see Code § 45-3).
Plaintiff Thomas Anonymous (plaintiff father) resides in defendant City of Rochester (City) with his son, plaintiff Jiovon *141 Anonymous (plaintiff son), who was born in January 1992. Plaintiffs commenced this action seeking a declaration that certain sections of the ordinance are unconstitutional, and seeking to enjoin defendants from enforcing the ordinance,[2] and plaintiffs thereafter moved for judgment granting that relief. Plaintiffs allege that the ordinance is inconsistent with several state statutes and violates a number of rights guaranteed to plaintiffs under the New York and United States Constitutions. Supreme Court denied plaintiffs’ motion and granted defendants’ motion to dismiss the complaint pursuant to CPLR 3211 (a) (7). For the reasons that follow, we conclude that plaintiffs are entitled to the relief sought.
I
In section 45-1 of the Code, the City Council sets forth its “Findings and purpose” with respect to the ordinance as follows:
“A. A significant number of minors are victims of crime and are suspects in crimes committed during the nighttime hours, hours during which minors should generally be off the streets and getting the sleep necessary for their overall health and quality of life. Many of these victimizations and criminal acts have occurred on the streets at night and have involved violent crimes, including the murders of teens and preteens.
“B. While parents have the primary responsibility to provide for the safety and welfare of minors, the City also has a substantial interest in the safety and welfare of minors. Moreover, the City has an interest in preventing crime by minors, promoting parental supervision through the establishment of reasonable standards, and in providing for the well-being of the general public.
“C. A curfew will help reduce youth victimization and crime and will advance the public safety, health and general welfare of the citizens of the City.”
*142 The record indicates that the City Council and other city officials determined to address the problem of youth victimization and crime by means of a curfew following the violent deaths of three boys between June 2001 and October 2005. First, a 10-year-old boy was shot to death in front of 185 Whitney Street as he watched a dispute over a drug deal. Second, in an unrelated incident involving a drug house, a 12-year-old boy was shot and killed at 18 Langham Street. Third, a 14-year-old boy was stabbed to death during an altercation with adult bar patrons on Meigs Street. Following those tragic incidents, the City Council held community meetings and began to consider enacting a juvenile curfew ordinance. The Chair of the City Council’s Public Safety Committee, along with representatives from the City’s Police Department (Police Department) and the community, traveled to Minneapolis, Minnesota to review the operation of that city’s curfew ordinance. Upon his return, the Chair of the Public Safety Committee began advocating the adoption of an ordinance modeled on the Minneapolis ordinance. In addition, one of the police officers drafted a report for defendant Chief of Police setting forth statistical information concerning juvenile crime and victimization in the City, which was distributed to defendant Mayor and the City Council. Enactment of a juvenile curfew ordinance thereafter garnered the support of the Chief of Police, the Mayor and the City Council President. After conducting public hearings, the City Council adopted the ordinance.
The ordinance provides that, during the designated hours (see Code § 45-3), it is unlawful for a minor to be in a public place unless “the minor can prove that” one of the six enumerated exceptions applies (Code § 45-4). The first exception is for minors accompanied by a parent, guardian or “other responsible adult” (Code § 45-3 [A]). The term “responsible adult” is defined as “[a] person 18 years of age or older specifically authorized by law or by a parent or guardian to have custody and control of a minor” (Code § 45-2). Second, a minor may be in a public place during curfew hours if he or she is engaged in lawful employment or is en route to or from such employment (see Code § 45-4 [B]). The third exception is for a minor “involved in an emergency situation” (Code § 45-4 [CD, and the term “emergency” is defined as “[a] circumstance or combination of circumstances requiring immediate action to prevent property damage, serious bodily injury or loss of life” (Code § 45-2). The fourth exception is for a minor “going to, attending, or return *143 ing home from an official school, religious, or other recreational activity sponsored and/or supervised by a public entity or a civic organization” (Code § 45-4 [D]). Pursuant to the fifth exception, a minor may be in a public place during curfew hours “for the specific purpose of exercising fundamental rights such as freedom of speech or religion or the right of assembly protected by the First Amendment of the United States Constitution or Article I of the Constitution of the State of New York, as opposed to generalized social association with others” (Code § 45-4 [E]). Finally, the sixth exception is for minors “engaged in interstate travel” (Code § 45-4 [F]).
A violation of the ordinance constitutes a “violation” as defined in the Penal Law (see Code § 45-5), and a police officer may detain a minor or take a minor into custody for a curfew violation “if the police officer, after speaking with the minor and considering the facts and surrounding circumstances . . . [Reasonably believes that the minor has violated” the ordinance and that none of the six exceptions set forth in the ordinance applies (Code § 45-6 [B]). If the minor is taken into custody, the officer “shall take the minor to a location designated by the Chief of Police” (Code § 45-6 [C]).
Police Department General Order 425, “Curfew Ordinance Enforcement,” provides that the Police Department’s policy is “to handle curfew violations in the least coercive reasonable alternative manner based on the [officer’s] discretion taking into consideration the needs and best interests of the Minor, as well as the need for protection of the community.” General Order 425 further provides that an officer who believes that a minor is in violation of the curfew ordinance may direct the minor to proceed directly home with a warning, take the minor into protective custody, transport the minor to a parent, guardian or other responsible adult, or transport the minor to a curfew facility, i.e., the Curfew Center at Hillside Children’s Center. In addition, General Order 425 sets forth the procedures for searching, transporting and handcuffing minors taken into custody for a violation of the curfew ordinance.
II
Our analysis of the ordinance begins with our recognition that the City has broad power to enact local legislation for “[t]he government, protection, order, conduct, safety, health and well-being of persons or property therein” (Municipal Home Rule Law § 10 [1] [ii] [a] [12]; see NY Const, art IX, § 2 [c] [ii] [10]; *144 New York State Club Assn. v City of New York, 69 NY2d 211, 217 [1987], affd 487 US 1 [1988]). Despite its broad police power, however, the City “cannot adopt laws that are inconsistent with the Constitution or with any general law of the State” (Incorporated Vil. of Nyack v Daytop Vil, 78 NY2d 500, 505 [1991]; see Jancyn Mfg. Corp. v County of Suffolk, 71 NY2d 91, 96 [1987]). Thus, while a juvenile curfew ordinance may generally be a permissible exercise of a municipality’s police power (see Ramos v Town of Vernon, 353 F3d 171, 172 [2003]; Matter of Michael G., 99 Misc 2d 699, 700 [1979]; 2005 Ops Atty Gen No. 13), we are concerned here with the specific terms of the ordinance challenged by plaintiffs. We hold that the ordinance is inconsistent with general laws of the State and with the New York and United States Constitutions.
Ill
We conclude first that the penal provisions of chapter 45 are inconsistent with Family Court Act § 305.2 and Penal Law § 30.00. Section 45-5 of the Code, entitled “Penalty,” provides that a curfew violation under section 45-3 “shall constitute a ‘violation’ as that term is defined in the New York State Penal Law,” i.e., (a criminal offense punishable by a term of imprisonment up to 15 days (see Penal Law § 10.00 [3]). Section 45-6 (B) authorizes a police officer to “detain a minor or take a minor into custody based on a violation of § 45-3.” Pursuant to Family Court Act § 305.2 (2), however, a police officer is authorized to take a child under the age of 16 into custody without a warrant only in cases where an adult could be arrested for a crime, and a violation does not fall within the definition of a crime (see Penal Law § 10.00 [6]; see also Matter of Victor M., 9 NY3d 84, 87 [2007]). Defendants contend that a police officer detaining or taking a juvenile into custody for a curfew violation is akin to an officer returning a truant to school pursuant to Education Law § 3213 or taking a runaway home or to a facility for runaway children pursuant to Family Court Act § 718. Those statutes, like the ordinance, authorize police officers to detain and take juveniles into custody for conduct that does not constitute a crime. Unlike the ordinance, however, those statutes are entirely noncriminal in nature and do not authorize a criminal arrest (see Matter of Shannon B., 70 NY2d 458, 462-463 [1987]; Matter of Bernard G., 247 AD2d 91, 93-94 [1998]). Thus, “[r]egardless of what euphemistic term the police wish to employ to describe [the act of detaining or taking curfew viola *145 tors into custody], its legal consequence is indistinguishable from a formal arrest” (Matter of Martin S., 104 Misc 2d 1036, 1038 [1980]). By authorizing the arrest of minors under the age of 16 for a curfew violation, the ordinance is inconsistent with Family Court Act § 305.2 (2) (see generally Michael G., 99 Misc 2d at 701).
In addition, insofar as the ordinance provides that a minor under the age of 16 who violates the curfew ordinance commits a “violation,” the ordinance is inconsistent with Penal Law § 30.00. With the exception of certain designated felonies, that statute establishes that the age of 16 is the minimum age for criminal responsibility under the Penal Law (see § 30.00 [1]). The City may not, consistent with the legitimate exercise of its police power, supersede that general law of the State.
IV
If the ordinance applied only to minors under the age of 16, there would be no need to address the constitutional issues raised by plaintiffs inasmuch as the conflicts between the ordinance and the pertinent provisions of the Family Court Act and the Penal Law exist only with respect to minors under the age of 16. “We are bound by principles of judicial restraint not to decide constitutional questions ‘unless their disposition is necessary to the appeal’ ” (Matter of Clara C. v William L., 96 NY2d 244, 250 [2001]). Here, however, the ordinance also applies to persons such as plaintiff son, who is now between the ages of 16 and 17 years old, and thus we address certain of plaintiffs’ constitutional challenges.
Plaintiffs challenge the ordinance, inter alia, under the Equal Protection Clauses of the United States Constitution (see US Const, 14th Amend, § 1) and the New York Constitution (see NY Const, art I, § 11). Our analysis of that challenge is the same under both provisions inasmuch as “our State Constitution’s equal protection guarantee is as broad in its coverage as that of the Fourteenth Amendment” (Golden v Clark, 76 NY2d 618, 624 [1990]; see Matter of Esler v Walters, 56 NY2d 306, 313-314 [1982]). With respect to each provision, our analysis begins with determining the appropriate level of judicial scrutiny (see Matter of Rosenstock v Scaringe, 40 NY2d 563, 564 [1976]; Ramos, 353 F3d at 174). Generally, a party challenging a municipal ordinance must overcome “[t]he exceedingly strong presumption of constitutionality” applicable to legislative enactments (Lighthouse Shores v Town of lslip, 41 NY2d 7, 11 [1976]). Here, *146 the court applied the rational basis standard, pursuant to which an ordinance will be sustained provided that it is rationally related to a legitimate government interest (see Cleburne v Cleburne Living Center, Inc., 473 US 432, 439-440 [1985]). The court, quoting Lighthouse Shores (41 NY2d at 12), concluded that plaintiffs had the burden of demonstrating “that ‘no reasonable basis at all’ existed for the curfew ordinance to be passed.”
We conclude that the court erred in applying that standard, and that a higher level of scrutiny applies to plaintiffs’ equal protection challenges. A heightened level of scrutiny is appropriate where a legislative classification disadvantages a suspect class or burdens the exercise of a fundamental right (see Plyler v Doe, 457 US 202, 216-217 [1982]). Although age is not a suspect class (see Gregory v Ashcroft, 501 US 452, 470 [1991]), we agree with plaintiffs that the ordinance infringes on plaintiff son’s fundamental right of free movement because it affects the right of plaintiff son “with parental consent to walk the streets, move about at will, meet in public with friends, and leave [his] house[ ] when [he] please[s]. This right to free movement is a vital component of life in an open society, both for juveniles and adults” (Ramos, 353 F3d at 172; see Johnson v City of Opelousas, 658 F2d 1065, 1072 [1981]; Waters v Barry, 711 F Supp 1125, 1134 [1989]).
Because juvenile curfew ordinances implicate the fundamental right of free movement, several courts have applied strict scrutiny in reviewing equal protection challenges to those ordinances (see e.g. Nunez by Nunez v City of San Diego, 114 F3d 935, 946 [1997]; State v J.P., 907 So 2d 1101, 1109 [Fla 2004]; City of Wadsworth v Owens, 42 Ohio Misc 2d 1, 2-3, 536 NE2d 67, 69 [1987]; Allen v City of Bordentown, 216 NJ Super 557, 571-572, 524 A2d 478, 485-486 [1987]). Other courts, most notably the Second Circuit in Ramos, have concluded that “the inherent differences between children and adults, both mental and physical,” warrant an intermediate level of scrutiny (353 F3d at 179; see Hutchins v District of Columbia, 188 F3d 531, 541 [1999]; Schleifer by Schleifer v City of Charlottesville, 159 F3d 843, 847 [1998], cert denied 526 US 1018 [1999]). We recognize that the rights of minors are not coextensive with those of adults (see generally Ginsberg v New York, 390 US 629, 649-650 [1968, Stewart, J., concurring], reh denied 391 US 971 [1968]), and that the City has broader authority over the actions of minors than the actions of adults (see Prince v Massachusetts, *147 321 US 158, 168 [1944], reh denied 321 US 804 [1944]). Given the fundamental nature of the right of free movement, however, we do not believe that an intermediate degree of scrutiny is appropriate to review the burdens imposed by the ordinance on a minor’s exercise of that right (see Nunez, 114 F3d at 946). Rather, we conclude that
“the legislative differentiation here in treatment between youths and adults is to be examined under strict scrutiny and may be justified only by the existence of a compelling [governmental] interest to be served by the differentiation, and even then only if no less restrictive means are available to satisfy that compelling [governmental] interest” (People ex rel. Wayburn v Schupf, 39 NY2d 682, 687 [1976]).
V
Although we conclude that strict scrutiny is the appropriate standard of review, we conclude in any event that the ordinance does not withstand even intermediate scrutiny. To satisfy that standard, the City “must show that the challenged classification serves ‘important governmental objectives and that the discriminatory means employed [are] substantially related to the achievement of those objectives’ ” (Ramos, 353 F3d at 180, quoting Wengler v Druggists Mut. Ins. Co., 446 US 142, 150 [1980]). The stated goals of the ordinance include reducing youth victimization and crime, and advancing “the public safety, health and general welfare of the citizens of the City” (Code § 45-1 [C]).[3] Plaintiffs do not deny that the City’s interest in preventing crime and victimization by persons of any age is compelling (see generally United States v Scott, 450 F3d 863, 870 [2006]), or that the City has an important interest in the safety, health and welfare of all its citizens (see generally Hodgson v Minnesota, 497 US 417, 444 [1990]). Rather, plaintiffs contend, and we agree, that the City has not shown a substantial relationship between the burdens imposed on juveniles by the curfew and the achievement of the City’s objectives.
We acknowledge that the City “need not produce evidence to a scientific certainty of a substantial relationship” (Ramos, 353 F3d at 183), and that the “dispute about the desirability or ultimate efficacy of a curfew is a political debate, not a judicial *148 one” (Schleifer, 159 F3d at 850). At the same time, however, the City must show a substantial relationship between the curfew and its goals in order “to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions” (Mississippi Univ. for Women v Hogan, 458 US 718, 725-726 [1982]).
The submissions by defendants in support of their motion to dismiss principally consist of: (1) affidavits of political officials involved in the adoption of the ordinance; (2) affidavits and reports of police officials responsible for enforcement of the ordinance; (3) crime statistics for the City; and (4) information concerning the implementation of juvenile curfews in other municipalities. A common theme of the first two groups of submissions is that city officials perceived a pressing need to respond to the problem of juvenile victimization and crime as a result of the aforementioned tragic deaths of three minors. The record establishes, however, that the 10-year-old and 12-year-old boys were killed during hours outside the curfew, and that the 14-year-old boy was already subject to an individualized curfew as the result of an adjudication that he was a person in need of supervision. Thus, there is no connection between the ordinance and the tragic events that spurred its enactment.
In addition, and importantly, the crime statistics prepared for the Chief of Police and reviewed by the City Council establish that minors are substantially more likely to be involved in crime or to be victims of crime during hours outside the curfew. Thus, “[although the [City’s] curfew aims to reduce juvenile crime and victimization at night, defendants produced nothing to show that any consideration was given to the nocturnal aspect of the curfew ordinance” (Ramos, 353 F3d at 186; see Nunez, 114 F3d at 948). Further,
“the curfew, by its terms, keeps the under-[17] set off the streets at night, but no effort seems to have been made by the [City] to ensure that the population targeted by the ordinance represented that part of the population causing trouble or that was being victimized (or that was even in particular danger of being victimized)” (Ramos, 353 F3d at 186).
Indeed, the crime statistics for the City demonstrate that the vast majority of violent crime during curfew hours is committed by persons over 18, and that adults are far more likely to be victims of such crime during those hours. The Mayor and the *149 Chief of Police expressed their opinions and beliefs concerning the particular vulnerability of juveniles during nighttime hours, but those opinions and beliefs are insufficient to demonstrate a substantial relationship between the ordinance and its goals.
“Although assumptions about children may suffice to establish the significance of the government’s interests and may even sustain the validity of a legislative enactment under a lower level of scrutiny, assumptions will not carry the government’s burden of showing the presence of the ‘requisite direct, substantial relationshipt ]’ . . . between the factual premises that motivated the enactment of a curfew and its terms” (id., quoting Mississippi Univ. for Women, 458 US at 725).
Finally, the information concerning the results of the implementation of juvenile curfews in other municipalities is equivocal at best and does not establish the necessary relationship between the ordinance and the goals of reducing juvenile crime and victimization. Thus, because the City has failed to demonstrate that the ordinance is substantially related to an important governmental interest, we hold that it is unconstitutional under the Equal Protection Clauses of the New York and United States Constitutions.
We further hold that the ordinance imposes an unconstitutional burden on the First Amendment rights of juveniles. The ordinance prohibits the presence of minors in any “public place” for five or six hours each day (Code § 45-3), and thereby restricts expression in all public forums for approximately one fourth of each day (see generally Nunez, 114 F3d at 950). “Being out in public is a necessary precursor to almost all public forums for speech, expression, and political activity . . . [The] relationship [of governmental regulation of nonspeech, i.e., the nocturnal activity of minors,] to expressive conduct is intimate and profound” (Hodgkins ex rel. Hodgkins v Peterson, 355 F3d 1048, 1059 [2004]). By subjecting juveniles to arrest merely for being in a public place during curfew hours, the ordinance forcefully and significantly discourages protected expression.
Defendants contend that the exceptions provided in section 45-4 of the Code, particularly the exception for First Amendment activity, adequately protect the rights of minors to engage in such protected activity. We reject that contention. Pursuant to section 45-4 (E), the minor must prove to the satisfaction of the police officer that he or she is “in the public place for the *150 specific purpose of exercising fundamental rights such as freedom of speech or religion or the right of assembly protected by the First Amendment of the United States Constitution or Article I of the Constitution of the State of New York.” The exception thus permits an officer to arrest a minor based solely upon the officer’s judgment whether the minor was engaged in constitutionally protected activity “as opposed to generalized social association with others” (id.). Further, even with the exception, the ordinance “leaves minors on their way to or from protected First Amendment activity vulnerable to arrest and thus creates a chill that unconstitutionally imposes on their First Amendment rights” (Hodgkins, 355 F3d 1048, 1051 [2004]). Nor does the exception “significantly reduce the chance that a minor might be arrested for exercising his [or her] First Amendment rights” (id. at 1064).
VI
Finally, we agree with plaintiffs that the ordinance interferes with plaintiff father’s right to direct and control the upbringing of plaintiff son. “[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder” (Prince, 321 US at 166). Among the stated goals of the ordinance is “promoting parental supervision through the establishment of reasonable standards” (Code § 45-1 [B]). We conclude, however, that the ordinance interferes with parental supervision and supplants plaintiff father’s reasonable standards by preventing plaintiff son from exercising his fundamental constitutional rights with plaintiff father’s permission, approval and encouragement (see Nunez, 114 F3d at 952; Johnson v City of Opelousas, 658 F2d 1065, 1073-1074 [1981]; Allen, 216 NJ Super at 574, 524 A2d at 487). As the court noted in Ramos, “we agree that the goal of encouraging parental responsibility is art admirable one, [but] we cannot help but observe the irony of the supposition that responsible parental decision making may be promoted by the government removing decisionmaking authority from responsible parents and exercising that authority itself’ (353 F3d at 182). We therefore conclude that the ordinance is unconstitutional on the ground that it violates the fundamental substantive due process right of plaintiff father to rear his child without undue governmental interference (see Nunez, 114 F3d at 951; see generally Ginsberg, 390 US at 639).
*151 VII
In view of our holding that the ordinance is inconsistent with state law insofar as it applies to minors under the age of 16 and imposes an unconstitutional restriction upon the rights of parents and all persons defined as minors under the ordinance, we do not address plaintiffs’ further challenges to the ordinance. Accordingly, we conclude that the judgment should be reversed, defendants’ motion denied, the complaint reinstated, plaintiffs’ motion granted, judgment granted in favor of plaintiffs declaring the ordinance unconstitutional, and defendants enjoined from enforcing the ordinance.

. The ordinance was initially enacted as a temporary measure, and was set to expire on December 4, 2006. It has been extended several times (Ordinance Nos. 2006-370, 2007-27, 2007-332, 2008-316), most recently to December 31, 2009 (Ordinance No. 2008-345).

. We note that plaintiffs label their pleading a “Petition and Complaint” and purport to seek relief “under 42 U.S.C. § 1983 and CPLR Articles 78 and section 3001.” We note that plaintiffs in fact seek no relief available in a CPLR article 78 proceeding, and we therefore ignore the erroneous designation of plaintiffs as petitioners-plaintiffs (see generally Matter of Vezza v Bauman, 192 AD2d 712, 713 [1993]).

. A third stated goal of the ordinance, “promoting parental supervision” (Code § 45-1 [B]), is discussed below.