**CITY OF PANORA, Appellee,**

v.

**David SIMMONS, Appellant.**

No. 87–1335.

Supreme Court of Iowa.

Aug. 16, 1989.

Connie A. Newlin, Des Moines, for appellant.

Randy V. Hefner of Van Werden, Hulse & Hefner, Adel, and William E. Bump, Stuart, for appellee.

LARSON, Justice.

David Simmons was found guilty of violating a Panora, Iowa, curfew ordinance which restricted the rights of children under eighteen to be in public places between ten o'clock p.m. and five o'clock a.m. The penalty imposed was small—a $1 fine plus surcharge and costs—but potential constitutional issues prompted us to grant discretionary review. We conclude that the ordinance is not unconstitutional on any of the grounds raised and therefore affirm.

The facts are undisputed. At 10:35 p.m., David Simmons, then fifteen, and a friend were skateboarding in a Panora shopping center. A police officer issued them citations for violating a Panora juvenile curfew ordinance which provided:

> 2.1–1.0301 CURFEW. A curfew applicable to minors is established and shall be enforced as follows:
>
> 1. Definition. The term "minor" shall mean, in this section, any unemancipated person below the age of eighteen (18) years.
>
> 2. Time limits. It is unlawful for any minor to be or remain upon any of the alleys, streets or public places or places of business and amusement in the city between the hours of ten (10) o'clock p.m. and five (5) o'clock a.m. of the following day.
>
> 3. Exceptions. The restriction provided by subsection 2.1–1.0301[2] shall not apply to any minor who is accompanied by a guardian, parent or other person charged with the care and custody of such minor, or other responsible person over eighteen (18) years of age, nor shall the restriction apply to any minor who is traveling between his home or place of residence and the place where any approved place of employment, church, municipal or school function is being held.
>
> 4. Responsibility of Adults. It is unlawful for any parent, guardian or other person charged with the care and custody of any minor to allow or permit such minor to be in or upon any of the streets, alleys, places of business, or amusement or other public places within the curfew hours set by subsection 2.1–1.0301[2], except as otherwise provided in subsection 2.1–1.0301[3].
>
> 5. Responsibility of Business Establishments. It is unlawful for any person, firm or corporation operating a place of business or amusement to allow or permit any minor to be in or upon any place of business or amusement operated by them within the curfew hours set by subsection 2.1–1.0301[2], except as otherwise provided in subsection 2.1–1.0301[3].
>
> 6. Enforcement. Any peace officer of this city while on duty is hereby empowered to arrest any minor who violates any of the provisions of Subsections 2.1–1.0301[2 & 3]. Upon arrest, the minor shall be returned to the custody of the parent, guardian or other person charged with the care and custody of the minor.

No criminal sanctions are provided by the ordinance, only a requirement that the police return the child to a parent or other responsible adult. Although a "fine" was imposed, apparently without authority under the ordinance, Simmons does not complain about that.

In the trial before the magistrate, neither Simmons nor the City was represented by an attorney. Simmons was assisted by his father, and the chief of police acted as both prosecutor and chief witness for the City.

At the magistrate trial, Simmons filed a motion to dismiss, raising some, but not all, of the constitutional objections now urged by him. The magistrate declined to rule on the motion to dismiss, stating that this was a matter to be ruled on by the district judge in the event Simmons was found guilty.

Simmons was found guilty, and he appealed. On the appeal to a district judge, Simmons was again assisted only by his father, although the City was represented at that point by its attorney. In the district court appeal, Simmons' father reminded the judge that the motion to dismiss filed in the magistrate proceeding was still unresolved and asked for a ruling. The motion to dismiss was overruled by the district judge, and Simmons' conviction was affirmed. When Simmons expressed an interest in seeking discretionary review of the case, an attorney was appointed to represent him at public expense. The discretionary review was granted; and at this point, several additional constitutional objections to the ordinance were raised by Simmons' attorneys.

The motion to dismiss in district court, both before the magistrate and the district judge, raised several constitutional issues but did not raise many of the issues frequently confronting courts in curfew cases, including equal protection, overbreadth, and interference with first amendment rights. Simmons attacked the ordinance only on the grounds of vagueness, unconstitutional interference with parenting rights, and unconstitutional interference with Simmons' rights of "gathering, walking or loitering," and our consideration of the ordinance is limited accordingly. Contrary to the assertions of the dissent, the first amendment was not mentioned in the motion to dismiss. The right to "gather, walk, or loiter" asserted by Simmons was not claimed in the context of speech or association, such as would be found in a protest march or similar form of "travel." We address in order the issues raised on appeal as to which error was preserved in the district court.[1]

## I. Vagueness.

Simmons argues that the ordinance is too vague to pass constitutional muster.

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222, 227–28 (1972) (footnotes omitted).

In incorporating these notions of fair notice and specific guidance for law enforcement officers, a two-part test has been

---

1. The district court resolved the appeal in a brief calendar entry which stated that the ordinance did not violate the first, fourth, fifth or fourteenth amendments. However, no specific issues other than those substantive due process issues discussed above had been raised or argued in the magistrate court or on the appeal to the district judge. The "resolution" of other issues not raised or argued appear to be surplusage in the district court's order.

adopted: the statute or ordinance must (1) give a person of ordinary intelligence fair notice of what is prohibited; and (2) provide an explicit standard for officers enforcing it. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903, 909 (1983); *State v. Duncan*, 414 N.W.2d 91, 96 (Iowa 1987); *Saadiq v. State*, 387 N.W.2d 315, 321 (Iowa 1986).

The City asserts that Simmons lacks standing to challenge the ordinance on vagueness grounds. If a statute does not reach a "substantial amount of constitutionally protected conduct" and is not impermissibly vague in all its applications, a party lacks standing to challenge the statute on vagueness grounds. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362, 369 (1982).

As one writer has noted,

> where the [alleged] vice is vagueness, the litigant asserting the vagueness defense must demonstrate that the statute in question is vague either in all possible applications or at least as applied to the litigant's conduct, and not simply as applied to some others.

L. Tribe, *American Constitutional Law* § 12–32, at 1036 (2d ed. 1988).

◼ Simmons' vagueness attacks in district court were directed only at sections 4, 5, and 6. Sections 4 and 5 prohibit the acts of certain adults and "business establishments," respectively, which allow violations of the ordinance by minors. Simmons, who does not fall in either of those categories, could not be prosecuted under these sections and therefore lacks standing to complain of any vagueness in them.

◼ Section 6 provides that a minor charged with violating the ordinance is to be returned to the minor's "parent, guardian or other person charged with the care and custody of the minor." Simmons complains that the phrase "other person charged with the care and custody of the minor" is vague, but in his case, he was simply ordered by the officer to go home; there is no question about whether the person to whom he was "returned" was a qualified person under the ordinance. Sim-

mons has therefore not been affected by application of this section. In addition, section 6 is only an "after-the-fact" enforcement provision; it has no notice-giving function for purposes of a vagueness analysis.

◼ On Simmons' appeal to this court, the main thrust of his vagueness argument is directed at section 3 which provides for the exceptions to the curfew. He claims that an "approved" place of employment, church, municipal or school function is too indefinite to be enforceable. The ordinance does not define the word "approved" nor does it specify who is to give such approval. The ordinance also provides that traveling to and from such activities is excepted, but the ordinance does not define "traveling." Simmons poses the question whether this means the traveling must be by vehicle or also includes walking. Also, the ordinance provides an exception for a minor who is accompanied by certain persons including parents, guardians, and "other responsible person[s]," but it does not define a "responsible person" other than to require that the person be over eighteen. The effect of these uncertainties, he claims, is to require a minor to guess at the meaning of the ordinance and would permit law enforcement officers to "speculate subjectively" as to what is forbidden.

The problem with Simmons' vagueness argument as to section 3 is that he did not raise it in district court. He asserted in his motion to dismiss only that section 3 violated article I, section 8 of the Iowa Constitution which deals with security of persons in their homes, a theory that he has not pursued on appeal. We conclude that Simmons did not have standing to raise vagueness arguments as to sections 5 and 6, and as to those provisions of section 3 to which he could claim standing, he failed to raise it. We therefore reject his vagueness arguments.

## II. *The Minor's Right to Travel About the City.*

Simmons argues that paragraph 2 of the ordinance is unconstitutional because "it

prohibits people from gathering, walking or loitering in public places" in the City. The City responds that these are not "fundamental" rights of minors and that the ordinance is constitutional if there is a rational basis underlying it.

 Whether the Panora curfew ordinance implicates Simmons' fundamental rights is a key question. If a fundamental right is infringed, the level of judicial scrutiny is raised from a rational relationship test to one of strict scrutiny. In that case, the statute will survive a constitutional challenge only if it is shown that the statute is narrowly drawn to serve a compelling state interest. *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147, 178 (1973) (citing *Kramer v. Union Free School Dist.*, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889–90, 23 L.Ed.2d 583, 589–90 (1969); *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969), and others).

The City suggests that the purpose underlying the ordinance is to help stem the tide of juvenile vandalism, crime and drug usage, and this ordinance, which provides as its only sanction the return of the child home, is a reasonable response.

*Interstate* travel is classified as a "fundamental right" for substantive due process and equal protection purposes, *Attorney Gen. of New York v. Soto–Lopez*, 476 U.S. 898, 901–04, 106 S.Ct. 2317, 2320, 90 L.Ed.2d 899, 904–06 (1986); *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 254, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306, 312 (1974). The exact source of the fundamental right of interstate travel is said to be uncertain, but it is probably based on the commerce clause or the privilege and immunities provisions of the United States Constitution. L. Tribe, *American Constitutional Law* § 16–8, at 1455 n. 3 (2d ed. 1988). Travel which is not interstate is, of course, not specifically mentioned in the constitution, and its status as a fundamental right has been debated. *Compare Waters v. Barry*, 711 F.Supp. 1125 (D.C.1989); *Allen v. City of Bordentown*, 216 N.J.Super. 557, 524 A.2d 478 (1987), *with Bykofsky v. Borough of Middletown*, 401 F.Supp. 1242 (M.D.Pa.1975), *aff'd*, 535 F.2d 1245 (3d Cir.), *cert. denied*, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976); *People in Interest of J.M.*, 768 P.2d 219 (Colo.1989).

The notion that a person's right to merely wander and stroll about town, as well as to travel interstate, is a fundamental right that appears to have its roots in the case of *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), in which Justice Douglas stated that "wandering and strolling," while

> not mentioned in the Constitution or in the Bill of Rights ... [are] unwritten amenities [which] have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence.

*Papachristou*, 405 U.S. at 164, 92 S.Ct. at 844, 31 L.Ed.2d at 117.

Regardless of the nature of the right to travel about town, the Supreme Court has made it clear that minors' activities and conduct on the street may be regulated and restricted to a greater extent than those of adults. In *Prince v. Massachusetts*, 321 U.S. 158, 168–69, 64 S.Ct. 438, 443, 88 L.Ed. 645, 653–54 (1944), the Court stated that

> [t]he state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities and in matters of employment. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers within a broad range of selection. Among evils most appropriate for such action are the crippling effects of child employment, more especially in public places, *and the possible harms arising from other activities subject to all the diverse influences of the street.* It is too late now to doubt that legislation appropriately de-

signed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action.

It is true children have rights, in common with older people, in the primary use of highways. But even in such use streets afford dangers for them not affecting adults. And in other uses, whether in work or in other things, this difference may be magnified. This is so not only when children are unaccompanied but certainly to some extent when they are with their parents. *What may be wholly permissible for adults therefore may not be so for children, either with or without their parents' presence.* (Emphasis added) (footnotes omitted).

In *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the Supreme Court considered the question of differential treatment of minors in determining the constitutionality of statutes. *Bellotti* noted that, in certain cases such as those involving the deprivation of liberty or property, the constitutional protections to be accorded minors are virtually coextensive with those of adults. *Bellotti*, 443 U.S. at 634, 99 S.Ct. at 3043, 61 L.Ed.2d at 807. In other areas, minors require special protection, and statutes may constitutionally reflect society's concern for three factors: (1) minors' peculiar vulnerability, (2) their inability to make sound judgments about their own conduct, and (3) courts' deference to the "guiding role of parents." *Id.* at 635–38, 99 S.Ct. at 3043–46, 61 L.Ed.2d at 808–10.

In applying *Bellotti*, the Colorado Supreme Court said in a recent case:

We believe that a child's liberty interest in being on the streets after 10:00 o'clock at night is not co-extensive with that of an adult. The three factors enumerated in *Bellotti* are all present in this case. Youths abroad at night are more vulnerable to crime and peer pressure than their adult counterparts. Similarly, a child's immaturity may lead to a decision to commit delinquent acts, such as vandalism, drug or alcohol use, or crimes of violence. Although adults may also make these decisions, they are more likely to do so in an informed and mature manner with full consideration of the consequences of their acts. Courts have recognized that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them. Finally, controlling a minor's freedom of movement after 10:00 p.m. reinforces parental authority and encourages parents to take an active role in supervising their children. In light of these considerations, we conclude that [the minor's] liberty interest in freedom of movement does not constitute a fundamental right.

*People in Interest of J.M.*, 768 P.2d at 223 (citation omitted).

The *Bykofsky* court also held that a juvenile's liberty interest in moving about should be analyzed under a rational relationship test for the purposes of a substantive due process challenge. It stated that

[t]o determine whether the curfew ordinance is a reasonable exercise of the Borough's police power and thus constitutional, the court must balance the minor's constitutional right to freedom of movement and his concomitant constitutionally protected interest to be upon and use the public streets during the nighttime hours under circumstances other than those provided for in the curfew exceptions against the aforementioned governmental interests advanced by the ordinance.

The interest of minors in being abroad during the nighttime hours included in the curfew is not nearly so important to the social, economic, and healthful well-being of the community as the free movement of adults. *Moreover, the ordinance contains numerous exceptions that allow minors to be on the streets during the curfew hours when they have a specific, important, legitimate purpose for being there or if they are accompanied by a parent. . . .*

*Bykofsky,* 401 F.Supp. at 1256 (emphasis added) (citations omitted); *accord City of Milwaukee v. K.F.,* 145 Wis.2d 24, 426 N.W.2d 329, 340 (1988).

We agree with these authorities that a minor's right of intracity travel is not a fundamental right for due process purposes, and the ordinance need not meet a strict scrutiny test. Rather, we need to determine only whether there is a rational relationship between the goals of the ordinance and the means chosen. We believe there is. In weighing the minor's interest in intracity travel against the City's interest in providing a prophylactic solution to the perceived problems inherent in unrestricted minor travel, we believe that the ordinance is a reasonable exercise of the City's power to legislate for the good of its citizens.

In reaching a contrary result, we believe the federal district court in *Waters* erred in its application of the *Bellotti* rationale. *Waters* found that the "peculiar vulnerability" of children was not a sufficient reason for establishing a juvenile curfew law, stating that "it is obvious that the plague afflicting the District[, including drugs and crime,] poses no peculiar danger to children." *Waters,* 711 F.Supp. at 1137. Our court has said that "[c]ourts should at least know what everyone else knows," *Stenberg v. Buckley,* 245 Iowa 622, 627, 61 N.W.2d 452, 455 (1954), and it is common knowledge that drug usage among minors has reached epidemic dimensions.

The United States Supreme Court in a recent case recognized this and upheld a city ordinance which prohibited intermingling of minors with adults in dance establishments. In doing so, the Court cited *Bellotti* and noted the peculiar vulnerability of youngsters to drug usage and sexual contact. *City of Dallas v. Stanglin,* 490 U.S. ——, ——, 109 S.Ct. 1591, 1595–96, 104 L.Ed.2d 18, 26–27 (1989) (applying rational-basis test).

In summary, we believe the ordinance in question is a legitimate exercise of Panora's powers designed to protect the safety and welfare of its children and any restrictions on a minor's intracity travel is not significant enough to create a constitutional problem.

### III. *Effect on Parents' Rights.*

■ Simmons also argues that the curfew unconstitutionally interferes with his parents' right to raise him and, therefore, unduly intrudes upon family autonomy. *See Wisconsin v. Yoder,* 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15, 34–35 (1972). The parents are not parties to this case, however, and the basis for Simmons' standing to challenge an interference with parenting rights is not clear. We do not believe there is merit in the argument in any event.

The City argues that, while a right to family autonomy exists, such rights are subject to the same limitations as other constitutionally protected rights and that minors are subject to reasonable regulations imposed by legislative authorities. The United States Supreme Court has stated that

> [t]he State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors....
>
> ... Thus, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

*Bellotti,* 443 U.S. at 637–38, 99 S.Ct. at 3045, 61 L.Ed.2d at 809–10 (1979) (footnotes omitted) (quoting *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944)).

While parents have the primary role in child-rearing, "[w]hen actions concerning the child have a relation to the public welfare or the well-being of the child, the state may act to promote these legitimate interests." *Bykofsky,* 401 F.Supp. at 1262. Under *parens patriae,* the state may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. *Prince,* 321 U.S. at 166, 64 S.Ct. at 442, 88 L.Ed. at 652. "In cases in which

harm to the physical or mental health of the child or to the public safety, peace, order, or welfare is demonstrated, these legitimate state interests may override the parents' qualified right to control the upbringing of their children." *Bykofsky,* 401 F.Supp. at 1264.

In the present case, the City has a strong interest in protecting minors from the national epidemic of drugs, and the curfew ordinance is a minimal infringement upon a parent's right to bring up his or her child. In effect, the Panora curfew ordinance acts to make parents the primary agent of enforcement. In addition, it could be said "to promote family life by encouraging children to be at home." Note, *Curfew Ordinances and the Control of Nocturnal Juvenile Crime,* 107 U.Penn.L.Rev. 66, 67 (1958). As the *Bykofsky* court stated:

> The ordinance does not dictate to the parent an over-all plan of discipline for the minor. With its numerous exceptions, including the one that permits the juvenile to be on the streets during the curfew hours if accompanied by a parent, the ordinance constitutes a minimal interference with the parental interest in influencing and controlling the activities of their offspring.

*Bykofsky,* 401 F.Supp. at 1264.

It is difficult, when judging Panora's ordinance, to determine if it forces parents to *abdicate* their authority over their children, or to *accept* such authority. In either case, the City's interference is minimal and its interest significant.

In summary, we conclude that the ordinance is not unconstitutional on any of the grounds urged and, therefore, affirm the district court.

AFFIRMED.

All Justices concur except LAVORATO, SCHULTZ, CARTER, and NEUMAN, JJ., who dissent.

LAVORATO, Justice (dissenting).

The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of working and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185–86, 87 L.Ed. 1628, 1638 (1943). Justice Jackson wrote these eloquent words about fundamental rights forty-six years ago. They are just as true today as they were then.

Recently Justice Marshall warned against sacrificing these fundamental rights to meet some perceived emergency:

> The issue in this case is not whether declaring a war on illegal drugs is good public policy. The importance of ridding our society of such drugs is, by now, apparent to all. Rather, the issue here is whether the Government's deployment in that war of a particularly draconian weapon—the compulsory collection and chemical testing of railroad workers' blood and urine—comports with the Fourth Amendment. Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great. History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. The World War II relocation camp cases, and the Red Scare and McCarthy–Era internal subversion cases, are only the most extreme reminders that when we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it.

*Skinner v. Railway Labor Executives Ass'n,* —— U.S. ——, ——, 109 S.Ct. 1402, 1422, 103 L.Ed.2d 639, 671–72 (1989) (citations omitted) (Marshall, J., dissenting).

Here the city passed the curfew ordinance to combat juvenile crime and to control a lack of parental supervision in the community. The city listed the first reason in its brief and mentioned the second in

oral arguments. For reasons that follow, I do not share the majority's view that this curfew ordinance is a reasonable response to either problem. The response is exactly the kind of unconstitutional excess Justice Marshall warned against.

The majority refuses to consider Simmons' claim that the curfew ordinance violates his right to travel under the first amendment. It relies on Simmons' alleged failure to raise the issue in district court. I think Simmons did raise the issue, and the majority should have addressed it. In his motion to dismiss, Simmons alleged that the ordinance was unconstitutional because it "prohibits people from gathering, walking, or loitering in public places"—all activities encompassed in the right to travel under the first amendment. The district court apparently thought Simmons had raised the issue because it spoke directly to the first amendment in its oral ruling:

> THE COURT: The court has considered your constitutional challenge under the first amendment.... When I listened to your arguments those were all the red flags that were raised, although you didn't put it in legal terms, you raised the ... first amendment and the court has considered [it] and has considered your motion to dismiss and everything contained therein....

Unlike the majority, I think the United States Supreme Court clearly decided that traveling, whether interstate or intrastate, is a fundamental right under the first amendment. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110, 116–17 (1972); *Aptheker v. Secretary of State*, 378 U.S. 500, 520, 84 S.Ct. 1659, 1671, 12 L.Ed.2d 992, 1005–06 (1964) (Douglas, J., concurring) ("Freedom of movement is kin to the right of assembly and to the right of association."); *Shapiro v. Thompson*, 394 U.S. 618, 629–30, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600, 612–13 (1969); *see also Johnson v. City of Opelousas*, 658 F.2d 1065, 1072 (5th Cir.1981). A hallmark of a free society, the right to travel, is perhaps the most cherished of all our fundamental rights. Because it enjoys the status of a fundamental right, the right to travel is protected against state intrusions by the due process clause of the fourteenth amendment. *Shapiro*, 394 U.S. at 629–30, 89 S.Ct. at 1328, 22 L.Ed.2d at 612–13 (1969).

When faced with a claim that a law infringes upon a fundamental right, courts must apply a strict scrutiny analysis. Under a strict scrutiny analysis, a law is constitutional *only if* the government can show that the law is both necessary and narrowly drawn to serve a compelling governmental interest. *Shapiro*, at 638, 89 S.Ct. at 1333, 22 L.Ed.2d at 617 (1969).

Like adults, children do have fundamental rights that the government must respect. *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731, 740 (1969). But the government has the power to place certain restrictions upon the conduct of children that would be unconstitutional if placed upon the conduct of adults. *Bellotti v. Baird*, 443 U.S. 622, 634, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797, 807 (1979).

In *Bellotti*, a plurality of the Court gave three reasons to justify the difference in treatment: (1) the peculiar vulnerability of children; (2) their inability to make critical decisions in an informed, mature manner; and (3) the importance of the parental role in child rearing. *Id.* One commentator sees each of these reasons as reflecting a different aspect of the Court's assumption that children are not fully competent to exercise their rights. Note, *Assessing The Scope of Minors' Fundamental Rights: Juvenile Curfews and The Constitution*, 97 Harv.L.Rev. 1163, 1173 (1984).

Because these reasons are tailored to children's unique developmental and emotional vulnerabilities, they give us a unique form of strict scrutiny pertaining solely to children. The author of the above note dubbed this unique scrutiny, "compelling for children." *Id.* at 1171.

A governmental restriction serves an interest "compelling for children" only if the restriction is narrowly drawn and only if one of the three *Bellotti* reasons justifies it. The analysis does not mean that children's rights are any less fundamental

than adults'; it only means that the special governmental interest must justify infringement of children's rights. If the government interest is not unique to children in terms of the *Bellotti* reasons, the government must then treat adults and children the same. *See* 97 Harv.L.Rev. at 1172–73.

Several courts have used this analysis in declaring unconstitutional juvenile curfew ordinances like the one here. *See Johnson,* 658 F.2d at 1073–74 (5th Cir.1981); *Waters v. Barry,* 711 F.Supp. 1125, 1136–37 (D.D. C.1989). Applying the analysis to the Panora ordinance, I conclude there is no basis for treating children different from adults: the ordinance serves no governmental interest "compelling for children."

The first *Bellotti* reason, the peculiar vulnerability of children, appears to be a sound basis for a juvenile curfew. Physically, children are generally smaller, weaker, and less capable of taking care of themselves than are adults. But if the government could merely use such vulnerabilities to justify juvenile curfews, the government could easily cite similar concerns to justify barring the elderly or physically impaired from the streets. The government could also extend such reasoning to exclude women or members of particular racial groups from certain areas of some cities. *See* 97 Harv.L.Rev. at 1175. Courts, however, have declared curfews affecting adults unconstitutional except when the government has temporarily imposed them during a state of emergency. *See, e.g., Yasui v. United States,* 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793 (1943) (infamous emergency curfew imposed upon citizens of Japanese ancestry during World War II upheld as constitutional exercise of emergency war powers). Because physical vulnerability alone does not sufficiently distinguish children from adults, the government cannot use this as an excuse to justify otherwise impermissible curfews aimed solely at children. *See* 97 Harv.L.Rev. at 1175.

The Court in *Bellotti* suggested that the government may, in some cases, require a doctor to notify a pregnant teen-ager's parents of her decision to have an abortion. (The Court struck down a state statute with such a provision because the statute had several other unreasonably restrictive provisions.) The Court recognized that this notice requirement restricted in some manner children's right to privacy. But the Court also recognized that a child in such circumstances faces an unavoidable decision in which either choice may result in serious emotional consequences. The Court reasoned that children simply do not have the maturity to make such critical decisions alone. *Bellotti,* 443 U.S. at 649, 99 S.Ct. at 3051, 61 L.Ed.2d at 817. This thinking forms the basis for the second *Bellotti* reason: the inability of children to make critical decisions in an informed, mature manner.

What critical decisions can children possibly face when they leave the home to do an errand for a parent, or to visit a friend, or to skateboard in a public place? I fail to see how this ordinance serves the "compelling for children" interest of protecting children from the potentially dangerous consequences of a critical decision.

I also fail to see how the ordinance promotes the third *Bellotti* reason: the parental role in child rearing. If anything, I think the ordinance inhibits the role. *See id.* at 638, 99 S.Ct. at 3035, 61 L.Ed.2d at 810; 97 Harv.L.Rev. at 1178.

The law recognizes that child rearing is the role of the parent, not the government. The government can interfere only when parents abuse or neglect their children. *See generally* Iowa Code ch. 232 (1989). The least amount of governmental interference furthers two goals: it preserves family autonomy and it promotes respect for governmental authority.

When the government passes a law that usurps parental authority over children's liberty, as this ordinance does, then it undercuts both goals. *See* 97 Harv.L.Rev. at 1179. Family autonomy suffers because the government, not the parents, tells children what liberties they can experience and when.

When the government imposes undue restrictions on children's liberties, children

may grow up believing they have less rights than they were led to believe they had. This belief can only engender disrespect for governmental authority. *See* Foster and Freed, *A Bill of Rights for Children*, 6 Fam.L.Q. 343, 375 (1972) ("[U]nless children are treated fairly and their rights are respected, it is idle to speak down to them about duty and responsibility."). This belief can also engender another equally disturbing result: children may discount important principles of our government as mere platitudes. *See* 97 Harv.L.Rev. at 1180. To the extent this happens, all citizens will eventually suffer.

For children to have a true sense of all the liberties and privileges this country has to offer, they must be allowed to experience them to the greatest extent possible. A government that promotes this principle is a government that is worthy of respect in the eyes of children. *See id.* at 1179. A government that ignores this principle does a disservice to all of us.

Simmons' father captured the essence of these bedrock principles in his argument to the district court:

> THE COURT: The question that the court posed, that the court did not have an opportunity to have answered was whether there is some contention that a dollar fine is an inappropriate sentence in this case.
>
> MR. SIMMONS: It is not the money. I am not here because of that, as you know.
>
> THE COURT: I don't know why you are here, sir. I'm sorry.
>
> MR. SIMMONS: Well, it has got something to do with the love of this country. It has got something to do with why my father and father-in-law spent three or four years overseas. It has got something to do with freedom and rights of our young. The rights of me. Do you know there are some of us who love this country enough that we will stand up and try to keep it together? How many times is it going to take before you can break it, before this is gone? How are we going to show our children this? If they are pushed over, they do not have

these freedoms, how are we going to teach them?

As I said earlier, the city passed this ordinance to combat juvenile crime and control the lack of parental supervision in the community. This thinking summarily brands all children in the community as potential law breakers and all parents as incapable of exercising parental supervision. As to the first reason, the Supreme Court soundly rejected curtailments of liberty based upon anticipation of criminal activity. *Papachristou*, 405 U.S. at 171, 92 S.Ct. at 848, 31 L.Ed.2d at 120 ("[T]he implicit presumption in these generalized vagrancy standards—that crime is being nipped in the bud—is too extravagant to deserve extended treatment."); *Tinker*, 393 U.S. at 509–11, 89 S.Ct. at 738–39, 21 L.Ed.2d at 739–40 (mere apprehension of further disruption is an insufficient ground for limiting minor's freedom of expression); *see also* 97 Harv.L.Rev. at 1177. As to the second reason, I simply do not believe— without proof—that there has been a total breakdown of parental supervision among families in Panora.

Despite these avowed reasons for the ordinance, the city failed to prove any juvenile crime in its community approaching a level of emergency. Nor did it prove that the vast majority of its parents has lost parental control. So, not only did the city fail to prove a "compelling for children" interest justifying this ordinance, it also failed to prove any necessity for it.

If juvenile crime is a problem in Panora, there are less drastic and more effective means available to combat it. For example, police may simply arrest juvenile offenders. *See Johnson*, 658 F.2d at 1071– 72, *Allen v. Bordentown City*, 216 N.J.Super. 557, 568, 524 A.2d 478, 484 (1987). They should not, however, restrict the liberty of all to combat the illegal activities of a few. *See* 97 Harv.L.Rev. at 1178.

One writer suggests another example: a juvenile court can, if it wishes, impose a curfew on juvenile offenders once the court determines the offenders have shown an inability to conduct themselves properly in public. L. Houlgate, *The Child & The*

*State,* 109–10 (1980). This approach would have the beneficial effect of dispensing justice in individual cases "while avoiding sweeping, class-based ordinances that are likely to result in injustice to many individuals." 97 Harv.L.Rev. at 1178 n. 75.

I have two more concerns. First, the city asks us to approve a type of law that has an ugly history. Born of prejudice, curfew ordinances have risen in popularity during some sad times in this country. Before the civil war, curfew laws in the south designated times when slaves could be on the streets. *See Curfew Statute, Ordinance, or Proclamation,* 59 A.L.R.3d 321, 326 (1974). During the late 1800s, immigrants were arriving in this country in great numbers. Though not treated as badly as slaves, the immigrants nevertheless faced prejudice. Curfew ordinances again became popular because of fears that immigrants would not control their children. *See* 97 Harv.L.Rev. at 1164 n. 9. In 1941 emergency curfews were imposed upon American citizens of Japanese ancestry. Ironically, some of our most decorated heroes in World War II were children of these Americans. *See* 59 A.L.R.3d at 349–51.

Second, the majority's heavy reliance on *Bykofsky v. Middletown* and *People in Interest of J.M.* is misplaced. Simply put, *Bykofsky* is wrong and we should not follow it. *See Johnson,* 658 F.2d 1065; *Waters,* 711 F.Supp. at 1136 (refusing to follow *Bykofsky* ). *Bykofsky* recognizes that the curfew there would have infringed the fundamental rights of adults. *Bykofsky,* 401 F.Supp. at 1254–55. Yet the court concluded that the ordinance affected no fundamental rights of minors and proceeded to apply a rational basis analysis to uphold it. *Id.* at 1265–66.

The reasoning in *Bykofsky* was backward. The court held that because the interests served by the curfew ordinance outweighed any infringement of the rights of minors, the ordinance affected no fundamental rights. *Id.* at 1265.

The court in *Bykofsky* should have applied a two-step analysis. First, it should have determined the right level of scrutiny by deciding whether a fundamental right was at stake; then, it should have considered whether the government's interest outweighed that right. The court simply relied on the fact that it was dealing with children to justify its use of a rational basis analysis. *See* 97 Harv.L.Rev. 1166 and n. 17. Because a fundamental right was clearly involved, the court should have used a strict scrutiny analysis as suggested in *Bellotti.* Perhaps the result would have been different had the court had the benefit of the *Bellotti* decision.

The Colorado Supreme Court in *People in Interest of J.M.* used the same faulty reasoning. The Colorado court went one step further by using the three *Bellotti* reasons to justify its conclusion that children do not have a fundamental right to travel. This approach is also wrong. *Bellotti* presupposes that a *fundamental right exists* and simply uses the three reasons to determine whether a governmental restriction can be placed on a fundamental right belonging to children. A "compelling for children" strict scrutiny analysis rather than a rational basis analysis is, therefore, the proper one under *Bellotti.* I think the majority here would agree that if this strict scrutiny analysis were used, the Panora ordinance would fail to pass constitutional muster.

The ordinance here barely survives a constitutional challenge on a narrow ground and on a wrong analysis. I question whether such an ordinance would survive a challenge based on overbreadth and denial of equal protection, other grounds many courts have used to declare curfew ordinances unconstitutional.

I would declare the ordinance here unconstitutional because it violates a child's fundamental right to travel under the first amendment. The vast majority of courts that have considered juvenile curfew ordinances have, for one reason or another, declared them unconstitutional. We should join these courts and resist any knee-jerk reaction to restrict fundamental rights because of some perceived emergency. Some

day we may come to regret the decision the majority reaches today.

I would reverse.

SCHULTZ, CARTER, and NEUMAN, JJ., join this dissent.